UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMOND D. WAGNER, <u>et al.</u> ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 00-1799 (TPJ) |
| ) | |
| THE ISLAMIC REPUBLIC OF IRAN, ) | **FILED** |
| <u>et al.</u>, ) | |
| ) | NOV 6 2001 |
| Defendants. ) | |
| ) | NANCY MAYER WHITTINGTON, CLERK |
| | U.S. DISTRICT COURT |

## DECISION AND ORDER

Shortly before noon on Thursday, September 20, 1984, U.S. Navy Petty Officer First

Class Michael Wagner died a violent death at his duty station at the U.S. Embassy in Beirut,

Lebanon. The manner of his death was homicide. The cause of death was massive trauma

sustained in the explosion of a car bomb driven onto the embassy compound at high speed and

detonated at the base of the building by a suicide bomber acting in the service of Hizballah (also

on occasion known as "Islamic Jihad"), a terrorist organization operating primarily in Lebanon at

that time.[1]

This action for the wrongful death of Michael Wagner is prosecuted by Raymond D.

Wagner, individually, and as representative of the Estate of Michael Wagner, his deceased son.

Co-plaintiffs are Michael Wagner's surviving younger siblings, Stephen W. Wagner and Rebecca

---

[1]Hizballah--meaning the "Party of God"--has been given various spellings by judges of
this U.S. district court. This Court will henceforth employ the spelling given the organization by
the U.S. Department of State in the official documents admitted into evidence.



Wagner Quate, and the Estate of Michael's deceased mother, Dorothy J. Wagner.[2]  Defendants are the Islamic Republic of Iran ("Iran") and the governmental agency known as the Iranian Ministry of Information and Security ("MOIS").  Neither Iran nor MOIS has deigned to appear and defend, and the case has therefore proceeded by default.  The action is brought pursuant to certain 1996 amendments to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, which enabled such actions to be brought for the first time, with the Court's jurisdiction being predicated upon 28 U.S.C. §§ 1330(b) and 1605(a)(7).  The Court held an evidentiary hearing on October 16-17, 2001, from which the facts set forth below are found pursuant to Fed.R.Civ.P. 52(a) upon evidence satisfactory to the Court.[3]

## I.

Michael Ray Wagner, a U.S. citizen, was born in Columbia, N.C., in July, 1954.  He attended college in North Carolina for four years, then enlisted in the U.S. Navy in June of 1977.  Trained by the Navy as an intelligence specialist, after serving at sea on the U.S.S. Midway and elsewhere in the Pacific region, Michael Wagner volunteered for assignment to the U.S. Embassy in Beirut, Lebanon, reporting for duty in November, 1983.

---

[2]Dorothy J. Wagner, originally a plaintiff when this action was filed on July 27, 2000, died on November 20, 2000.  Her executor, her surviving husband, Raymond D. Wagner, was substituted as plaintiff in her stead by Order of August 9, 2001.

[3]The defendants were properly served with process pursuant to 28 U.S.C. § 1608(a)(4), but failed to answer or otherwise respond to the complaint.  The Court granted plaintiffs' motion for entry of default on April 10, 2001.  Notwithstanding, 28 U.S.C. § 1608(e) provides that "[n]o judgment by default shall be entered by a court of the United States . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  The evidentiary hearing was therefore held to establish plaintiffs' right to a default judgment.

In 1983, Lebanon was a nation embroiled in a civil war, as it had been for several years. Armed factions organized largely upon religious orientations were contending with one another for control of the country, including, in particular, its capital, Beirut, with exchanges of heavy gunfire occurring daily at all hours throughout the city. Several neighboring countries were striving to affect the outcome, and two of them--Iran and Syria--were simultaneously exploiting the disorder in attempts to achieve a dominant influence in Lebanese affairs, as well as to expunge all Western influence, primarily American, from the Middle East region altogether. The principal weapon employed against Westerners was terrorism: kidnaping, hostage-taking, assassination, and the like, including car bombings. In the months preceding Wagner's arrival in Beirut, terrorist car bombs had destroyed the original U.S. Embassy in West Beirut in April, 1983, and the U.S. Marine barracks near the airport the following October. In November, 1983, when Wagner arrived in Lebanon, the U.S. Embassy had transferred embassy operations to a new building in East Beirut.[4]

Accordingly to the testimony of the U.S. Ambassador at the time, Reginald Bartholomew, on the morning of September 20, 1984, he was conferring with his British counterpart in his office on the sixth floor of the Embassy when the bomber made his approach to the building. Accelerating up the hill in a station wagon, the bomber was obliged to drive a sinuous course negotiating his way around several concrete barriers erected to impede such an attack. The vehicle was taken under fire by gunners of the Ambassador's Lebanese bodyguard

---

[4]The Embassy staff referred publicly to the new building as the "Embassy Annex" to avert the impression that the U.S. had been forced to abandon the older one, as in fact it had.

on the roof, as well as a British unit escorting its ambassador,[5] and the driver may well have been hit before detonating the bomb: He was unable to negotiate a sharp turn into the underground garage, later assumed to be his destination because the blast would have been yet more devastating had he reached it.

The vehicle exploded in the vicinity of a concrete cistern filled with water at the front of the Embassy. Although the cistern absorbed some of the force of the explosion, the bomb, containing, by Ambassador Bartholomew's informed estimate, some 1500 kilograms of explosives, demolished the embassy building, wounded the Ambassador, and killed Petty Officer Wagner, age 30, in the second floor office he shared with an Army colleague, Chief Warrant Officer Kenneth V. Welch, who was also killed. The blast also killed 12 Lebanese, wounded 60 other people, and rendered the second U.S. Embassy building in Beirut in less than two years uninhabitable.

## II.

The testimony of retired U.S. Ambassador Robert B. Oakley and Dr. Patrick L. Clawson, Director of Research at the Washington Institute for Near East Policy, together with declassified intelligence materials from the U.S. Department of State and the Central Intelligence Agency admitted into evidence by the Court, conclusively establish the identity of the perpetrators of the September 20, 1984, bombing of the U.S. Embassy in Beirut. As in the numerous prior kidnaping cases tried to this district court, the perpetrators were shown to be the militant Islamic

---

[5]The customary U.S. Marine detachment guarding U.S. embassies around the world elsewhere had been dispensed with at the Embassy in Beirut as being an unnecessary provocation to the Islamic population in Lebanon.

fundamentalist Shi'ite organization known as Hizballah, the Lebanese organization publicly

committed to the expulsion of the American presence in Lebanon by terrorist means, as well as

to the post-war reincarnation of Lebanon as an Islamic fundamentalist state. Hizballah, in turn,

has been shown to be an agency or instrumentality of the Iranian MOIS, employed (somewhat

less publicly) by the MOIS to achieve similar ends--by terrorist means when necessary--as well

to establish Iranian ascendancy as the premier Islamic patron of the Shi'a population in Lebanon.

On the day after the bombing, Ambassador Oakley, the newly appointed Director of the

Office of Terrorism, U.S. Department of State, traveled to Beirut to meet with Ambassador

Bartholomew. Within two weeks his investigation had acquired satellite photo evidence of an

exact replica of the obstacle-strewn approach to the U.S. Embassy, situated at the Sheik Abdullah

Barracks in the Bekka Valley of Lebanon, obviously constructed as a training device for the

suicide bomber-to-be. Iranian Revolutionary Guards were known to be quartered at the barracks,

where members of Hizballah were also quartered and trained, and in other cases the barracks

have been shown to be one of the places of confinement for American hostages seized by

Hizballah.

In summary, the testimony and documentary evidence is largely duplicative of the

evidence upon which this and other district judges have repeatedly found that Hizballah has

committed acts of terrorism at the behest of, and with the direction, support, and collaboration of

the Iranian MOIS.

### III.

A foreign state is generally immune from the jurisdiction of the courts of the United

States under the FSIA. See 28 U.S.C. § 1604. The FSIA does, however, contain certain

statutory exceptions to the broad grant of sovereign immunity it accords foreign states, one of which affords the basis upon which this Court may entertain this suit.  See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 11 (D.D.C. 1998).  In the amendments to FSIA enacted by the Antiterrorism and Effective Death Penalty Act of 1996, Congress empowered private litigants to sue foreign states that sponsor terrorism for certain acts that result in personal injury or death if either the claimant or a victim was a citizen of the United States at the time.  Specifically, section 1605(a)(7) of the FSIA authorizes a cause of action against a foreign state for:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency . . . .

28 U.S.C. § 1605(a)(7).

Thus, for this Court to exercise subject matter jurisdiction over plaintiffs' claims in this case, the evidence must establish that (1) Iran has been designated a state sponsor of terrorism at the time the act occurred, unless later so designated as a result of such act; and (2) either Michael Wagner or plaintiffs were United States citizens at the time of the incident.[6]  Both conditions are satisfied here.  Iran was formally declared a state sponsor of terrorism on January 23, 1984, by U.S. Secretary of State George P. Schultz, and both Michael Wagner and his surviving kin, the plaintiffs, have at all times been U.S. citizens.

---

[6]In cases where the act complained of occurred within the foreign state against which the claim has been brought, the claimant must also afford the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration.  18 U.S.C. § 1605(a)(7)(B)(i).  Because the act complained of here occurred in Lebanon--not Iran--this condition is inapplicable to the case.

Plaintiffs' cause of action is predicated on the murder of Michael Wagner in the September, 1984 bombing of the U.S. Embassy in Beirut by Hizballah.[7]  It is clear that the suicide bombing of the U.S. Embassy was a deliberate and premeditated act that qualifies as an extrajudicial killing for purposes of the FSIA.  See Flatow, 999 F. Supp. at 16-18 (suicide bombing of a tourist bus that resulted in the death of plaintiff's daughter was an extrajudicial killing).  There is no evidence that it was judicially sanctioned by any lawfully constituted tribunal.[8]  It is equally apparent from the evidence before this Court that Hizballah, a terrorist organization substantially funded and supported by Iran and MOIS since 1979, perpetrated the September 20, 1984 terrorist bombing of the U.S. embassy in Beirut.

Plaintiff Raymond D. Wagner, in his own right and as administrator/executor of the estates of Michael and Dorothy Wagner, and plaintiffs Steven W. Wagner and Rebecca W. Quate seek to recover the compensatory damages customarily awarded in cases of wrongful death--the economic loss to the decedent's estate; recompense for his conscious ante mortem pain and suffering; and solatium for the emotional anguish of his surviving kin--proximately occasioned by Michael Wagner's demise.  Each element of recovery is expressly authorized by the FSIA.

_____

[7]Although the events complained of in this case occurred principally in 1984, Congress expressly directed that the FSIA be retroactively applied through its enactment of the Antiterrorism and Effective Death Penalty Act of 1996, P.L. 104-132, section 221(c) ("The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of the Act [April 24, 1996].").

[8]An "extrajudicial killing" under the Act is given the same meaning as that set forth in section 3 of the Torture Victim Protection Act of 1991; namely, "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation."  28 U.S.C. § 1605(e)(1); 28 U.S.C.A. § 1350 note.

<u>See</u> 28 U.S.C. § 1605(a)(7) note.  Plaintiffs also ask that this Court award punitive damages

against defendant MOIS for its role in providing material support and resources to Hizballah.[9]

As a preliminary matter, this Court has determined to apply federal common law to

calculate the relief to which plaintiffs are entitled.  In doing so, it remains consistent with the

analyses made by other judges of this district court in previous FSIA cases involving claims for

personal injury or death resulting from state-sponsored terrorism.  <u>See</u> <u>Flatow</u>, 999 F. Supp. at

14-15; <u>see</u> <u>also</u> <u>Sutherland v. Islamic Republic of Iran</u>, 151 F. Supp. 2d 27, 47 (D.D.C. 2001).

The <u>Flatow</u> court found that, in creating both subject matter jurisdiction and federal

causes of action for personal injury or death resulting from state-sponsored terrorism, Congress

intended that the federal courts "create coherent national standards to support this initiative of

national significance." <u>Flatow</u>, 999 F. Supp. at 15.  To accomplish this, the <u>Flatow</u> court

employed federal common law "to determine whether the terrorist acts were within the scope of

[the perpetrators'] office, agency, or employment, <u>as well as any other conclusions of law which</u>

<u>typically rely upon state law</u>." <u>Id.</u> (emphasis supplied).

The federal choice of law rule follows the Restatement (Second) of Conflicts.  <u>See</u> <u>Liu v.</u>

<u>Republic of China</u>, 892 F.2d 1419, 1426 (9th Cir. 1989).  Section 175 of Restatements (Second)

of Conflicts provides:

> In an action for wrongful death, the local law of the state where the injury occurred
> determines the rights and liabilities of the parties unless, with respect to the particular
> issue, some other state has a more significant relationship under the principles stated in

---

[9]Punitive damages may not be assessed against the Islamic Republic of Iran, but may be
awarded against an instrumentality of a foreign state.  <u>See</u> <u>Anderson v. Islamic Republic of Iran</u>,
90 F. Supp. 2d 107, 114 (D.D.C. 2000); <u>Alejandre v. Republic of Cuba</u>, 996 F. Supp. 1239, 1253
(S.D. Fla. 1997).

> [section] 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatements (Second) of Conflicts, § 175 (1969).  Because Michael Wagner's death occurred in Lebanon, and not a state of the United States, the principles set forth in section 6 of the Restatements (Second) of Conflicts are best achieved by applying federal common law.[10]  Other possible choices of state law, such as the law of North Carolina (e.g., where the decedent formerly resided or his kindred reside now) or the District of Columbia (where the suit was brought), would eventually lead in other cases to divergent measures of recovery for essentially identical claims against foreign defendants guilty of terrorist crimes against U.S. citizens.[11]  See

---

[10]Section 6 of Restatements (Second) of Conflicts provides:
> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatements (Second) of Conflicts, § 6 (1969).

[11]As a practical matter in this case, the elements of recovery for wrongful death and pain and suffering under either the law of North Carolina or the District of Columbia are essentially identical to one another and to federal common law: all jurisdictions authorize a personal representative of the deceased to claim damages measured as the economic loss caused by the death of a person wrongfully killed, and a claim for pain and suffering where the decedent suffered physical and mental pain in the interval between infliction of injury and onset of death. See N.C. Gen Stat. § 28A-18-2 (2000); D.C. Code Ann. §§ 16-2701 and 12-101 (2000).  While solatium as such is not apparently recoverable in the District of Columbia, see Flatow, 999 F. Supp. at 29, it may be awarded under North Carolina law, as well as federal common law, for bereavement, i.e., mental anguish resulting from the loss of a decedent's society and companionship, see N.C. Stat. Ann. § 28A-18-2(b)(4)(c); see Flatow, 999 F. Supp. at 30.  In an intentional homicide case such as this, however, solatium appears in any event to be

generally Restatement (Second) of Conflicts, § 6.  Specifically, in FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, the application of federal common law  will ensure the greatest level of predictability and uniformity.

## IV.

At the time of his death, Michael Wagner had served over seven years as an enlisted petty officer in the U.S. Navy, reaching the pay grade of E-6.  From all accounts, Michael was a conscientious and effective intelligence analyst.  He received numerous commendations and consistent evaluations of superior performance over the course of his career.  Senior officers rated him as of the "highest caliber" of enlisted personnel and singled him out as a role model for younger enlistees.  Recognizing Michael's potential, just weeks before his death the Navy had abbreviated  Michael's planned tour of duty in Beirut and ordered him back to the United States to attend Officer Candidate School.  The qualities and character that he had evinced in his enlisted career would, of course, have served him equally well as a commissioned officer.

Based upon a Census Bureau computation of the present value of lifetime earnings for individuals of the same age, sex, and education as Michael Wagner, Dr. Bradley R. Schiller, an expert economist, opined that the economic loss to Michael's estate over the course of what would have been his expected lifetime of productive work amounted to approximately $2,423,000.00.  Dr. Schiller then estimated Michael's lost retirement benefits, both military and civilian, at $858,245.00.  Thus, the sum of economic loss damages recoverable as a consequence

---

indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort.  See D.C. v. Thompson, 570 A.2d 277, 289-90 (D.C. 1990).

of Michael's death totals $3,281,245.00.[12]  Accordingly, the Court will award damages for

economic losses resulting from his wrongful death in the amount of  $3,281,245.00 to Michael's

estate.

 With regard to Michael's <u>ante mortem</u> pain and suffering, there is minimal evidence to

suggest that Michael may have survived the initial bomb explosion, dying from his physical

injuries some minutes later, during which he may well have been in agony.  Raymond and

Steven Wagner both recall that at Michael's funeral at Arlington National Cemetery they were

told by someone who had been present at the U.S. Embassy on the day of the bombing that

Michael was alive in the rubble shortly after the explosion, although he expired moments later.

Unfortunately, neither was able to recall the individual's name, and being without any indicia as

to the credibility of the account, the Court is unable to ascribe any probative value to the hearsay

assertion of an unidentified eyewitness.  The Court has no option but to deny the plaintiffs'

claims for Michael's pain and suffering.

 The FSIA also entitles plaintiffs to monetary damages for solatium, or loss of Michael's

society and companionship, and according to the Restatement (Second) of Torts, "one who by

extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to

another is subject to liability for such emotional distress."  Restatement (Second) of Torts,

section 46 (1986).  It goes without saying that the act of purposefully detonating a large

explosive charge adjacent an occupied building constitutes extreme and outrageous conduct in

---

[12]The figures were based on Dr. Schiller's assumptions that Michael would have been
commissioned,  retired from the Navy as a commissioned officer after a 20-year career, and
pursued a comparably sophisticated civilian occupation for the remainder of his working life.

-11-

any civilized society.

The testimony at trial was persuasive in establishing that over the past seventeen years since Michael Wagner's death, the individual plaintiffs have each of them suffered intense mental anguish (or emotional distress) at the remembrance of the circumstances of Michael's death and in the absence of his society and companionship ever since. Indeed, they will mourn him the rest of their respective lives. The evidence fully supports the conclusion that Michael Wagner was a central figure in the Wagner family--a beloved son and brother who enjoyed a deep and close relationship with each of his parents, his brother, and his sister. Moreover, it is significant that the terrorist act that resulted in Michael's death was both unforeseen and horrific, a circumstance that renders grief all the more difficult to resolve. See Flatow, 999 F. Supp. at 30 (sense of loss more acute in case of death that was both sudden and violent). While it is always difficult to place a monetary value on so intangible an injury as the loss of a loved one, other judges of this district court have made awards of solatium under the FSIA in similar cases that provide some useful benchmarks for awarding compensation here.

In Flatow, the father of a female university student killed in a suicide bombing of a tourist bus in Israel brought a wrongful death action against Iran and the MOIS on behalf of his daughter's estate, proving that the Palestine Islamic Jihad had conducted the bombing at the direction of and with the support of Iran and MOIS. Flatow, 999 F. Supp. at 6-7. After finding Iran and the MOIS culpable, the court awarded $5 million to each parent and $2.5 million to each sibling of the deceased for solatium based upon the close-knit nature of the family and the magnitude of the suffering they experienced as a result of the young woman's death. Id. at 32; see also Eisenfeld, 2000 WL 1918779, at *8 (D.D.C. July 11, 2000) (awarding $5 million to each

-12-

parent and $2.5 million to each sibling of two American students killed in a suicide bombing of a bus in Israel). In Elahi v. Islamic Republic of Iran, 124 F.Supp. 2d 97, 99 (D.D.C. 2000), a brother brought a wrongful death action against Iran and the MOIS for ordering the assassination of his older brother, a naturalized U.S. citizen. The court awarded $5 million to each brother of the deceased for solatium, concluding that their loss "may be said to be that of a brother and a father." Id. at 112.

Like the victims in Flatow, Eisenfeld and Elahi, Michael Wagner was an integral part of a closely knit family, as surely beloved as were any of these victims by parents and siblings alike. Therefore, Michael's parents and siblings should be compensated to a like extent.

It is true that, unlike the act of terrorism shown in Flatow, in this case the targeting of the U.S. Embassy--and the U.S. citizens known to be within--more closely resembles the targeted assassination in Elahi. The victim in Flatow was an unintended casualty of an attack directed at others. Petty Officer Wagner, as a United States serviceman, was as much the intended target of Hizballah's attack as was the U.S. Embassy itself. Any distinction, however, is both fortuitous and illusory; the anguish of the survivors is none the less by reason of it, and the level of malevolence of Hizballah's murderous conduct is the same, whether directed at innocent Americans or innocent citizens of other countries. Therefore, this Court believes the following amounts are appropriate to compensate the individual members of Michael's family for their grief and the loss of his society and companionship:

Raymond D. Wagner (father):        $5,000,000.00.

-13-

Estate of Dorothy J. Wagner (mother):      $3,000,000.00.[13]
Steven Wagner (brother):                   $2,500,000.00.
Rebecca Wagner Quate (sister):             $2,500,000.00.

**V.**

Plaintiffs also seek an award of punitive damages. While the FSIA explicitly exempts a

foreign state from such damages, see 28 U.S.C. § 1606, an "agency or instrumentality" of a

foreign state may be liable for punitive damages. See 28 U.S.C. § 1603(b). Other FSIA cases in

this district court have consistently assessed punitive damages against the MOIS for terrorist acts

committed by its minions in Hizballah. See Sutherland, 151 F. Supp. at 52 (awarding

$300,000,000.00 in punitive damages against MOIS); Jenco v. Islamic Republic of Iran et al.,

154 F. Supp. 2d 27, 39 (D.D.C. 2001) ($300,000,000.00 in punitive damages against MOIS);

Elahi, 124 F. Supp. 2d at 114 ($300,000,000.00); Anderson, 90 F. Supp. 2d at 114

($300,000,000.00); Flatow, 999 F. Supp. at 34 ($225,000,000.00); but see Eisenfeld, 2000 WL

1918779, at *8 ($150,000,000.00). The calculus employed has generally been three times the

amount of the most current estimates of Iran's annual expenditures for the terrorist activities it

expects MOIS to conduct. (To date no other non-sovereign entities have been named as

defendants and implicated as agents or instrumentalities of Iran).

The record in this and the cases cited above is clear: MOIS played an intimate and

significant role in sponsoring terrorist activities directed at Americans in Lebanon from 1979

---

[13]An award for solatium must necessarily compensate a claimant for past, present, and
future suffering. Because Mrs. Wagner is now deceased, her solatium damages reflect only her
loss of Michael's companionship during her lifetime. Accordingly, they are somewhat less than
that of Raymond Wagner, who must continue to bear the loss of his son, but are still more than
that of Steven and Rebecca, who are compensated less as siblings, consistent with the awards of
solatium damages in Flatow and Eisenfeld.

forward, including the bombing of the U.S. Embassy in September, 1984.  Now more than ever, this Court believes that the acts of terrorists and their sponsors must be punished to the full extent to which civil damage awards might operate to suppress such activities in the future.  Indeed, Dr. Clausen opined that since the terrorist attacks of September 11, 2001, Iran has become increasingly aware of the pending FSIA lawsuits against it here in the United States, and a failure to impose a substantial punitive award against MOIS might be misinterpreted as an inclination on the part of the courts of the United States to be more tolerant of Iranian-sponsored terrorism of a somewhat distant past.  That may be a policy option of diplomacy, but not of the law.  Terrorism, past and future, is the implacable enemy of all civilization under law.   Therefore, consistent with past awards of three times the amount of MOIS's estimated annual budget for terrorist activities, this Court awards plaintiffs $300 million in punitive damages against the MOIS.

It is therefore, this _6th_ day of November, 2001,

ORDERED, that judgment be entered in favor of the plaintiffs against defendants the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, for compensatory damages as follows:

| | |
|---|---|
| Estate of Michael Wagner: | $3,281,245.00. |
| Estate of Dorothy J. Wagner: | $3,000,000.00. |
| Raymond D. Wagner: | $5,000,000.00. |
| Steven W. Wagner: | $2,500,000.00. |
| Rebecca Wagner Quate: | $2,500,000.00. |

IT IS FURTHER ORDERED, that judgment be entered in favor of plaintiffs, jointly and

severally, against the defendant Iranian Ministry of Information and Security for punitive

damages in the amount of $300,000,000.00; and it is

FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in accordance

with the foregoing; and it is

FURTHER ORDERED, that plaintiffs may arrange for this Decision and Order to be

translated into Farsi and, at plaintiffs' request, the Clerk's Office shall cause a copy of the

translated Decision and Order to be transmitted to the U.S. Department of State for service upon

defendants through diplomatic channels.

Thomas Penfield Jackson
U.S. District Judge

-16-